CHARLES F. THIEL, PLAINTIFF-RESPONDENT, v. RINA C.
THIEL, DEFENDANT-APPELLANT, AND KOPPERS COM-
PANY, INC., GARNISHEE-RESPONDENT.

Argued November 4, 1963—Decided February 3, 1964.

*Mr. Louis Gluck* argued the cause for defendant-appellant.

*Mr. Walter F. Waldau* argued the cause for garnishee-respondent (*Messrs. Stryker, Tams & Dill,* attorneys; *Mr. Waldau* and *Mr. John C. Lifland,* of counsel).

No appearance by plaintiff-respondent.

The opinion of the court was delivered by

SCHETTINO, J. The defendant, Rina C. Thiel, appealed from an order of the matrimonial branch of the Superior Court, Chancery Division, discharging an order to show cause which, *inter alia,* had enjoined garnishee, Koppers Company, Inc., from disposing of pension funds due plaintiff from Koppers. While the appeal was pending in the Appellate Division, we certified it on our own motion.

The Thiels were married in 1945 and are childless. They were residents of New Jersey at the time; Mrs. Thiel still resides here. Her husband moved to Florida after a *pendente lite* support order was entered against him in this proceeding. The defendant wife filed several complaints against her husband in the Bergen County and Hudson County Juvenile and Domestic Relations Courts resulting in various support orders which, the wife alleges, plaintiff did not obey. On April 11, 1962 plaintiff filed a suit for a divorce alleging a 1958 desertion. The wife denied the allegations and counterclaimed for support and counsel fees. By the *pendente lite* order dated June 13, 1962 the court granted her $52 per week for support and $150 counsel fees and costs. Plaintiff complied to a limited extent for support but made no payment of counsel fees and costs. He finally stopped all payments, retired with a pension of $185.74 per month from his job with Koppers and as stated above moved to Florida. Plaintiff's pension appears to be his only asset in our State.

In September 1962 defendant brought contempt proceedings against plaintiff and thereafter moved to cut off her husband's pension payments, to sequester the pension funds, and

to have them paid to her directly in satisfaction of the support order.

The labor contract between the employer and plaintiff's union, which created the pension, a noncontributory one, provided that: "No assignment of any pension will be recognized or permitted nor shall any pension or payment on account of any pension be subject to attachment, execution or other legal process against the PENSIONER." The parties orally stipulated before the trial court that this provision was the subject of long negotiations between the company and the union.

On the basis of the exemption clause, plaintiff and Koppers contested defendant's motion. The trial court held this clause to preclude relief and entered the order appealed from.

The issue before us is whether the above-quoted exemption bars recourse to the husband's pension payments for the wife's support. We limit our decision to the particular contract and its provision and to the facts of this case.

## I.

A man's duty to support his family is one of the highest obligations in our social order. In *Bonanno v. Bonanno,* 4 *N. J.* 268, 273 (1950), we said: "The duty to support and maintain his wife is the husband's primary obligation and arises out of the status of wedlock by reason of public policy recognized and enforced by civil and common law, and by the legislation incorporated in *R. S.* 2:50–39 (*PL* 1907, *ch.* 216, *sec.* 26, *p.* 482)." The obligation is such that even though he may not be able to work, if he has other means, he is required to apply them equitably in the discharge of this duty. (at *p.* 273)

The public's concern with that duty is evidenced, for examples, by the persistence of that obligation despite discharge in bankruptcy, 11 *U. S. C. A.* § 35, *subd.* a (2), (*Supp.* 1962), by the continued availability of the extraordinary process of contempt for its enforcement, *N. J. S.* 2A:10–1, and by the

enactment in New Jersey and elsewhere of reciprocal legisla-
tion to compel residents to discharge the duty owed to non-
resident dependents. *N. J. S.* 2A:4–30.1 *et seq.*

## II.

We need refer to but a few authorities to conclude how
vastly important is the pension plan in our state and federal
economy and welfare. For examples, see 76 *Monthly Labor
Review,* "Pension Plans under collective bargaining. Study
of 300 plans in effect in autumn 1952," *pp.* 237–45, 484–89,
714–22 (1953) and 1960 *Study of Industrial Retirement
Plans* by Bankers Trust Company, New York. Professor
Neil W. Chamberlain of Columbia University, in his book
*LABOR* (1958), pointed out the contributions which pen-
sion plans have made (at *pp.* 573–4) :

"One contribution is sufficiently evident that little need be said·
about it. The channeling of part of the fruits of our increasing
productivity into provision for an adequate living to those who had
previously made their contribution to society has meant that millions
of individuals can look forward to retirement with assurance, free
of that gnawing fear which was so prevalent prior to 1935—fear of
privation in one's old age, of dependence on others. This is an
incalculable gain, to which the private programs have contributed by
providing supplements to Federal benefits which have made retirement
income adequate.

A second advantage, much less frequently recognized, is the addi-
tional stability which the pension programs have given to our economy.
Pension income quickly finds its way into the expenditure stream, and
its absolute size—estimated conservatively at more than 15 billion
dollars by 1960—makes it an item of some importance in supporting
consumption and production. Moreover, by providing income directly
to the pensioners it has released their families from the necessity of
making special provision for them, thus freeing additional funds for
consumption. Finally, in times of recession and unemployment it acts,
like unemployment compensation, to stem the decline of income.
Individuals eligible for pensions but who have not retired are likely
to withdraw from the labor force altogether if they are laid off even
temporarily."

The public policy in New Jersey regarding pensions was set
forth in *Fischer v. Fischer,* 13 *N. J.* 162, 165–166 (1953) :

"A pension * * * is a stated allowance or stipend to one retired from service, in consideration of past services. The pensioning of civil servants, *as well as those in private employment*, is designed primarily to attain suitable standards of service at a relatively low wage cost, by a guarantee against want when the servant's years of productivity have ended, thus heightening the morale of the workers and enhancing the quality of the service. *Plunkett v. Board of Pension Commissioners of Hoboken*, 113 *N. J. L.* 230, 173 *A.* 923 (*Sup. Ct.* 1934), affirmed 114 *N. J. L.* 273, 176 *A.* 341 (*E. & A* 1935). Considered in context, the immunity clause constitutes a protection against improvidence and creditors in the broad general sense of persons whose claims are grounded in contract or tort, or a penalty or forfeiture, to insure sustenance and a measure of economic security for the pensioner *and his dependent family in the evening of life when earning power has diminished or ceased altogether.* * * * " (Emphasis supplied)

## III.

 Regardless of the precise and restrictive wording of an exemption provision, the restraint created should not be a barrier against recourse to the fund when it provides the only reasonably accessible asset for support of the wife within her state of residence. *Cf. Schlaefer v. Schlaefer, 71 App. D. C.* 350, 112 *F. 2d* 177, 130 *A. L. R.* 1014 (1940). The purpose of exemptions is to relieve the person exempted from the pressure of claims hostile not only to his own essential needs but also to those of his dependents. But the purpose cannot be one relieving him of familial obligations, perhaps destroying what may be the family's last and only security, short of public relief. The husband's duty is to share his pension benefits with his wife, and the courts of the state of her residence, if they have jurisdiction over the fund, ought to enforce that duty when there is no other reasonably practical means of obtaining support open to her within the state. Moreover, if we were to uphold his claim of exemption, we would "feed the husband and starve the wife." *Wetmore v. Wetmore*, 149 *N. Y.* 520, 529, 44 *N. E.* 169, 171, 33 *L. R. A.* 708 (*Ct. App.* 1896).

We have recognized the same philosophy when dealing with a statutory exemption of a pension. In *Fischer, supra,* the court said (13 *N. J.,* at *p.* 167):

"\* \* \* it is abundantly clear that the policy of the immunity provision is to shield the pensioner against the coercive remedial and executorial processes available to *creditors*, and thus *to secure the pensioner and his family* against improvidence and want. \* \* \* the terms of the exemptive clause of the statute under review, [are] designed \* \* \* to secure the pension *against the claims of third persons* as a means of support for the pensioner and his family.

Such is the outstanding policy of the statute. \* \* \*" (Emphasis added)

We note that *N. J. S. A.* 43:16–7, the statutory provision in Fischer, reads as follows: "All pensions granted under this chapter shall be exempt from execution, garnishment, attachment, sequestration or other legal process." The provision before us is essentially the same: "No assignment of any pension will be recognized or permitted nor shall any pension or payment on account of any pension be subject to attachment, execution or other legal process against the PENSIONER."

*Fischer* stated (13 *N. J.*, at *p.* 165) :

"The argument is that this immunity is by its terms embracive of all judicial processes to enforce decrees for alimony. It is said that the provision expresses a 'legislative social policy' freeing such pensions 'from direct attack from any source, when not deliberately created to defeat the claims of creditors, leaving the person otherwise free to enforce his claim by other legal and equitable remedies against' the pensioner, 'and not against the *res*.' \* \* \* and it is remarked that in none of the statutory immunity clauses of the various pension acts is there in terms 'an exception in favor of a divorced wife.'"

The court rejected the argument barring recourse to the statutory pension for to do so "would be perversive of the true intent and meaning of the act," and would "subvert the laws enjoining upon the husband the performance of [the] basic obligation of the marriage state." (13 *N. J.*, at *p.* 168)

Thus, by ruling against a husband in a case involving a provision which on its face appears equally protective of the husband's interest as the labor contract provision here involved, *Fischer* gave effect to the strong public policy in favor of the support of the wife and children. *Cf. Zirk v. Nohr,* 127 *N. J. L.* 217 *(E. & A.* 1941).

Koppers relies on *Hoffman v. Hoffman,* 8 *N. J.* 157, 28 *A. L. R. 2d* 1205 (1951), for the proposition that such a clause is valid and enforceable against a wife's claim for support. There, plaintiff, a resident of California, had obtained a divorce and an order for alimony in California and sought to collect certain arrearages by attaching her ex-husband's interest in an annuity policy issued by the Prudential Insurance Company of America, a New Jersey corporation, under a group insurance contract between the ex-husband's employer and Prudential. The ex-husband was also a nonresident of New Jersey.

*Hoffman* is distinguishable. In deciding that case, the Court conceived that relief should be denied because both husband and wife were nonresidents and the wife resided in a state wherein she could not obtain the relief she sought in New Jersey with respect to a contract so drawn. 8 *N. J.,* at *p.* 165, 28 *A. L. R. 2d* 1205. It is sufficient to note that the New Jersey wife in the present case seeks recourse to the only asset of her husband with a situs in New Jersey, *i. e.,* the pension fund. In such case our public policy as expressed in *Fischer* outweighs the contractual limitations asserted by the husband and his employer.

## IV.

Pension fund provisions in a labor contract should be equitably administered. A claim against the pension funds, however, is to be limited to the special facts of the case to the end that an order, just and equitable to all parties, shall result. For example, the *pendente lite* order was obviously based upon an income of the husband of much more than the amount of the pension payments. On proper application by the husband a new support order might well be necessary.

Another example is that Koppers argues that the imposition of an order as requested by the wife would be a burden on it, on the union and on other beneficiaries of the pension plan. We are not impressed by the argument. Koppers'

only duty will be to pay in accordance with the mandate of the court and when it does so, it will be relieved of further liability. If additional expenses result from the husband's actions, Koppers might well be reimbursed out of the pensioner's funds unless its contract with the union bars such reimbursements.

To avoid needless expenses by encumbering the proceedings with the appointment of a receiver or by a sequestration, the trial court could order Koppers to pay directly to the wife a periodic sum for the current support and for arrears, costs and counsel fees until these items are fully paid. She alone is entitled to the collections, except with respect to so much thereof as represents her counsel's interest therein, and, as to his interest, no difficulty should arise, but if any should, the order may be appropriately modified. Of course, the order will require Koppers to make payments only so long as plaintiff shall be entitled to receive pension benefits.

Reversed and remanded for proceedings not inconsistent with this opinion.

*For reversal and remandment*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.