In re Roy J. MOSLEY, Debtor.

Theodore LISCINSKI, Jr., Trustee,
Plaintiff,

v.

Roy J. MOSLEY, Crocker National Bank, Standard Oil Company of California and Chevron U.S.A., Inc., Defendants.

Bankruptcy No. 82–08473.
Adv. No. 83–1284TS.

United States Bankruptcy Court,
D. New Jersey.

Aug. 14, 1984.

Theodore Liscinski, Jr., Trustee, pro se.

Steven P. Russo, Toms River, N.J., for Roy J. Mosley.

Wilentz, Goldman & Spitzer by Helen D. Chaitman, Woodbridge, N.J., for Standard Oil Co. of California and Chevron, U.S.A., Inc.

OPINION

AMEL STARK, Bankruptcy Judge.

*Facts and Procedural History*

1. Roy J. Mosley filed a voluntary petition under Chapter 7 of the Bankruptcy Code on December 8, 1982. This court entered a discharge of the Debtor on April 22, 1983 and the Debtor appeared at the discharge hearing required under section 524(d) of the Bankruptcy Code on June 28, 1983.

2. On October 7, 1983, the Trustee filed a complaint against the Debtor, Standard Oil Co. of California ("SOCAL"), Chevron, USA, Inc. ("Chevron") and Crocker National Bank seeking turnover of the entire value of the Debtor's interest in an Annuity Plan, Stock Plan and Savings Plan for Employees of SOCAL and Participating Companies. The complaint incorrectly identified Crocker National Bank as administrator of the Savings Plan; Crocker National Bank has not filed an answer to the complaint.

3. The complaint also alleged that the Debtor owned a time-sharing interest in a vacation home at Shawnee Village, Pennsylvania. The trustee voluntarily dismissed this count of the complaint on April 30, 1984.

4. On February 2, 1984, SOCAL and Chevron filed a motion for summary judgment on the ground that the Debtor's interest in the SOCAL Plans is excluded from property of the estate under section 541(c)(2) of the Bankruptcy Code.

*The SOCAL Plans*

5. Most of the facts relevant to this motion are set forth in the affidavit of Charles H. Mackdanz, Manager of the Benefits Staff of SOCAL, dated January 24, 1984. The Trustee has not contested Mr. Mackdanz's statements. Briefly, the Debtor is a current employee of Chevron and participates in the following benefit plans administered by SOCAL:

(a) The Annuity Plan for Employees of SOCAL and Participating Companies (the "Annuity Plan");

(b) The Stock Plan for Employees of SOCAL and Participating Companies (the "Stock Plan"); and

(c) The SOCAL Savings Plan (the "Savings Plan") (collectively the "benefit plans").

The SOCAL Plans are qualified plans under section 401(a) of the Internal Revenue Code (26 U.S.C. Section 401(a)) and contain the language prohibiting the assignment or alienation of benefits under such plans that is required by section 401(a)(13) of the Internal Revenue Code and section 206(d) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. section 1056(d)(1).

Section 17(e) of the Annuity Plan states in pertinent part:

"The interest and property rights of any person in the Plan, in the Trust Fund or in any payment to be made under the Plan shall not be subject to option nor be assignable either by voluntary or involuntary assignment or by operation of law, including (without limitation) bankruptcy, garnishment, attachment or other creditor's process, and any act in violation of this Section 17(3) shall be void."

Similarly, Section 17(b) of the Stock Plan provides in pertinent part:

"Except as otherwise provided in Section 8 or by applicable law, the interest or property rights of any person in the Plan, in the Trust Fund or in any distribution to be made under the Plan shall not be subject to option nor be assignable, either by voluntary or involuntary assignment or by operation of law, including (without limitation) bankruptcy, garnishment, attachment, levy, execution or any other or equitable process, and any act in violation of this Subsection (b) shall be void."

Finally, Section 17(b) of the Savings Plan provides in pertinent part:

"The interest or property rights of any person in the Plan, in the Trust Fund or in any distribution to be made under the Plan shall not to subject to option nor be assignable, either by voluntary or involuntary assignment or by operation of law, including (without limitation) bankruptcy, garnishment, attachment or other creditor's process, and any act in violation of this Subsection (b) shall be void."

The Debtor has vested interests in the SOCAL Plans. However, he is not qualified to receive any distributions of those interests until the earlier of the termination of his employment with Chevron or the year 2000.

## A. *The Annuity Plan*

Debtor was born February 16, 1945. He began to work with Chevron on September 19, 1966. Under the provisions of the Annuity Plan, Debtor's normal retirement date will be March 1, 2010. The Annuity Plan allows Debtor to receive a refund of his member contribution prior to 2010 only if he ceases employment. Debtor's member contributions as of September 30, 1983 totalled $1,534.62. If Debtor were to cease his employment, he would lose the portion of his annuity derived from pre-July 1981 employer contributions as well as his rights to participate as an annuitant in certain employee welfare plans. In addition, Debtor would forfeit the right to the Annuity Plan's post-retirement spousal annuity.

The Annuity Plan entitles Debtor to a vested annuity from employer contributions if he leaves employment before 25 years of service and before age 65. Even under these circumstances, Debtor would not be able to receive any type of annuity until 2000, when he reached age 55. If Debtor ceased employment now, he would not be entitled to any payment from employer contributions at all until the year 2000. At that time he would be entitled to receive approximately $40,429.

## B. *The Savings Plan*

Debtor's interest in the Savings Plan is his ESOP account. As of September 30, 1983, the balance in Mr. Mosley's ESOP account totalled 132.940 shares of SOCAL common stock. Mosley is entitled to distribution of his SOCAL stock only upon termination of his employment.

## C. *The Stock Plan*

Debtor's interest in the Stock Plan consists of a member account comprised of employee contributions and a contingent account comprised of employer contributions. As of June 30, 1983, the plan held 9.839 shares of SOCAL common stock in his member account and 1,226.576 shares of SOCAL common stock in his contingent account, valued by the Debtor at $33,771.33 as of January 1983. Upon the termination of his employment, Debtor would be entitled to receive a distribution of his interests in the stock held in his member and contingent accounts. The Stock Plan offers Debtor the option of deferring the distribution until his 70th birthday.

Thus, under all three of the SOCAL Plans, Debtor has no present ability to receive any distribution of his interests unless he terminates his employment with Chevron.

## DISCUSSION

If the Debtor's interest in the three benefit plans were included in the estate, the Trustee would own his interest subject to all restrictions which the plans had imposed on the Debtor. 11 U.S.C. § 541. The Trustee would therefore be unable to collect the benefits from the plan at least until the Debtor terminated his employment with Chevron. If the Debtor's interest in the plans is not to be included in the estate, the Debtor would be free to terminate his employment shortly after filing his petition and collect, free from the claims of his creditors, approximately $40,000 from the three benefit plans. The Trustee contends that Congress could not have intended to allow such a fraud upon creditors. SOCAL asserts, however, that Congress intentionally chose, in enacting ERISA, to strongly encourage employee participation in such benefit plans, and that the Bankruptcy Code has specifically continued the protections of ERISA in bankruptcy proceedings.

### *Statutes*

This dispute involves apparent conflicts between numerous federal statutes. Section 541(a) of the Bankruptcy Code provides that the commencement of a case under title 11 creates an estate which includes "all legal or equitable interests of the debtor in property as of the commencement of the case." Section 541(c)(2) creates an exception to this broad inclusion of all of the debtor's property in the estate. It states:

"A restriction on the transfer of a beneficial interest of the debtor in a trust

that is enforceable under applicable non-bankruptcy law is enforceable in a case under this title." 11 U.S.C. Section 541(c)(2).

Resolution of the motion for summary judgment focuses on the proper interpretation of this subsection.

Section 522(d)(10) provides that when a debtor's benefit plan is included in property of the estate, the debtor is entitled to an exemption for the following part of his entitlement to benefits:

"The debtor's right to receive—

.    .    .    .    .

(E) a payment under a stock bonus, pension, profitsharing, annuity, or similar plan or contract on account of illness, disability, death, age, or length of service, *to the extent reasonably necessary for support of the debtor and any dependent of the debtor,* unless

(i) such plan or contract was established by or under the auspices of an insider that employed the debtor at the time the debtor's rights under such plan or contract arose;

(ii) such payment is on account of age or length of service; *and*

(iii) such plan or contract does *not* qualify under section 401(a), 403(a), 403(b), 408 or 409 of the Internal Revenue Code of 1954 . . . ." (Emphasis added.)

The Employee Retirement Income Security Act of 1974 (ERISA) is contained partly in the Internal Revenue Code and partly in Title 29 of the United States Code, and it contains an anti-alienation requirement for employee benefit plans in each of these titles. Section 401(a)(13) of the Internal Revenue Code states:

"A trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part *provides that* benefits provided under the plan may not be assigned or alienated." 26 U.S.C. § 401(a)(13) (emphasis added).

Section 206(d) of ERISA provides:

"Each pension plan shall *provide that* benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1) (emphasis added).

In addition, section 514(a) of ERISA governs the extent to which ERISA preempts state laws relating to employee benefit plans:

"Except as provided in subsection (b) of this section, the provisions of this subchapter (which includes 29 U.S.C. 1056(d)(1), quoted above) and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan described in section 1003(a) of this title. . . ." 29 U.S.C. § 1144(a) (emphasis added).

Finally, section 514(d) of ERISA concerns the effect of ERISA on other federal law:

"Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair or supersede any law of the United States . . . or any rule or regulation issued under any such law." 29 U.S.C. § 1144(d).

### *Arguments of the Parties*

The central issue in this controversy is whether the Debtor's benefit plans are excluded from the estate under Bankruptcy Code section 541(c)(2), because they would be exempt from process under "applicable nonbankruptcy law." Although the words "applicable nonbankruptcy law" would seem to refer to all law other than Title 11, there is some disagreement among the courts as to whether they refer to federal or state law. SOCAL argues that the restrictions on transfer contained in the three SOCAL plans would be enforceable under either ERISA or under the New Jersey law of spendthrift trusts, so that the Debtor's interest in the Plans is excluded from the estate in either case. In order to insulate its employee benefits from the vicissitudes of state laws, SOCAL favors a rule which would exclude all ERISA-qualified plans from becoming property of a debtor's estate. It asserts that the words "applicable non bankruptcy law" should be given their most natural meaning, to include all law

other than that expressed in and derived from Title 11.

A number of courts have held that section 541(c)(2) should be interpreted to include ERISA among "applicable nonbankruptcy law," but in most of these cases the trust at issue would have qualified as a spendthrift trust under state law also, and it was therefore unnecessary to decide the issue. Other courts insist that Congress must have intended only to preserve the Bankruptcy Act exclusion of *traditional* spendthrift trusts and not to extend it to a wide range of IRA, Keogh and self-settled ERISA plans. The court will first determine to what extent the Debtor's benefit plans would be exempt under state and federal law.

### New Jersey Spendthrift Trust Law

In general, the "American view" is that spendthrift clauses, which prohibit both voluntary and involuntary alienation of the principal and income of a trust, are enforceable against creditors. *Regan v. Ross*, 691 F.2d 81, 85 (2d Cir.1982); Restatement (Second) of Trusts Section 152(2) (1959). Normally, the only exceptions to this exemption are for dependents' claims for support, necessary services, or governmental claims. Restatement (Second) of Trusts Section 157 (1959). New Jersey, however, contrary to SOCAL's claim, does not honor spendthrift trust provisions but provides the same exemptions for all types of income whether or not obtained from a spendthrift trust. N.J.S.A. Section 2A:17–50 (West Supp.1983) provides:

> "When a judgment has been recovered ... and where *any* wages, debts, earnings, salary, *income from trust funds*, or profits are due and owing to the judgment debtor, or thereafter become due and owing to him, to the amount of $48.00 or more a week, ... the court shall grant an order directing that an execution issue against the wages, debts, earnings, salary, *income from trust funds*, or profits of the judgment debtor."

Alfred Clapp states in his treatise on the law of wills in New Jersey:

> "Certain restraints upon the voluntary or involuntary alienation of equitable interests given in trust give rise to what is known as a 'spendthrift trust.'"

> "Consider, first involuntary alienations. By force of the statute authorizing the issuance of execution, *a provision in a trust, to the effect that the creditors of the income beneficiary cannot levy upon his income, is nugatory; for the statute expressly subjects such income, and certain other kinds of income, to execution, exempting income which aggregates less than ($48) per week.* (N.J.S.A. Section 2A:17–50 (West Supp.1983)). Furthermore it limits a creditor's right to recovery to ten percent of the income unless that income exceeds ($7,500) per year, in which case the court may require a larger percentage to be paid over. (N.J.S.A. Section 2A:17–56.)" 6 New Jersey Practice, *Wills and Administration*, Section 540 at 63 (1962) (footnotes omitted) (emphasis added).

*See also* Griswold, *Spendthrift Trusts* Section 203 at 238–39 (1947).

The history of section 2A:17–50 is reviewed in *Cowan v. Storms*, 121 N.J.L. 336, 340–43, 2 A.2d 183 (Supr.Ct.1938) and in Griswold, *Spendthrift Trusts* Section 203 at 233–39 (1947). Prior to 1845, spendthrift trust provisions were not enforceable, but the statute of 1845, which provided for discovery of all sorts of assets, contained a specific exemption for nonself-settled spendthrift trusts. The case of *Hardenburgh v. Blair*, 30 N.J.Eq. 645 (1879), which held the statute to bar a creditor's effort to reach the income of a trust of $250,000, inspired an amendment to the statute to limit the protection to income not exceeding $4,000 per year. The limitation was revised to $18 per week in 1915 and was raised to $48 per week in 1969. N.J.S.A. 2A:17–50 (West Supp.1984).

After its exhaustive review of the history of the statutes, the court in *Cowan v. Storms*, 121 N.J.L. 336, 2 A.2d 183 (Supr. Ct.1938), allowed a judgment creditor to reach the income from a spendthrift trust, concluding:

"The true sense of these statutory provisions, taken and compared together in the light of their history and common law background, is that where, as here, the trust fund has not emanated from the judgment debtor himself, the income is subject only to partial appropriation in consonance with the statutory scheme." 121 N.J.L. at 343, 2 A.2d 183.

In reliance on the statute, the trial court in *Harcum v. Greene*, 111 N.J.L. 129, 166 A. 717 (Supr.Ct.1933) allowed execution against the income of a spendthrift trust which produced between $3,350 and $4,200 per year. The court explained that "(t)he plain mischief was that satisfaction of just debts might under the old law be avoided and the liberal construction of this remedial statute by its plain intendment is that it lays open to execution, income of this character." In *Halstead v. Westervelt*, 41 N.J.Eq. 100, 3 A. 270 (Ch.1886), the court refused to allow a lien on property held in trust for the judgment debtor because "(t)he trust was not created by the judgment debtor himself, nor did the fund proceed from him, but the former was created by and the latter proceeded from his grandfather. Such trust property cannot be reached to be applied to the satisfaction of the judgment *unless the income exceeds $4,000.* P.L. of 1880 p. 174." 41 N.J.Eq. at 103, 3 A. 270 (citation omitted) (emphasis added).

In *First National Bank v. Parker*, 87 N.J.Eq. 595, 101 A. 276 (1917) (E. & A.), in which a creditor was denied recovery from a trust because of unclean hands, Justice Swayze stated in dissent:

"We have not heretofore adopted in this state the doctrine of 'spendthrift trusts,' and our legislature has evinced hostility to them by subjecting income in excess of $4,000 to supplementary proceedings at law, even where the trust is created by another." 87 N.J.Eq. at 599, 101 A. 276.

In a case involving wages rather than trust income, the Supreme Court discussed the proper interpretation of R.S. 2:32–180, one of the predecessors of N.J.S.A. 2A:17–

50. *Mechanics Finance Co. v. Austin*, 8 N.J. 577, 86 A.2d 417 (1952). The defendant garnishee, a New York State corporation, argued that the statute should not be interpreted to allow execution against the wages of a judgment debtor employed by a foreign corporation. The court rejected this argument because "remedial statutes are to be liberally construed, although in substitution of the common law." The court explained:

"The statute is in aid of the execution of judgments, and is to be liberally construed to suppress the mischief and advance remedy. (Citations omitted.) The manifest reason of the provision is to render income of the prescribed classes available for the enforcement of judgments." 8 N.J. at 582, 86 A.2d 417.

Spendthrift trust clauses are enforceable, however, to the extent that they prohibit voluntary alienation ("anticipation") of benefits. This has caused a number of courts to speak in unqualified terms about the enforceability of spendthrift trusts, but each of these statements has been made in dictum or because of a failure to examine section 2A:17–50 or its predecessors. In *Trust Co. of New Jersey v. Gardner*, 133 N.J.Eq. 436, 439, 32 A.2d 572 (Ch.1943), the court held void an anticipation of future income, noting:

"The view generally taken by courts in this country is that restraints against alienation of anticipated life income are valid and enforceable, especially as to attempted voluntary alienation by the *cestui que trust.*"

The state's highest court in *Chelsea-Wheeler Coal Co. v. Marvin*, 134 N.J.Eq. 432, 35 A.2d 874 (EA 1944), suggested that contractual restraint on alienation might be equally effective against involuntary alienation, quoting with approval from one of the leading cases espousing the "American view," *Broadway National Bank v. Adams*, 133 Mass. 170 (1882). The court explained:

"The rationale of the decision is that the testator was the absolute owner of his property and had the right to impose

such restrictions, not repugnant to law, as he saw fit. The court disposed of the contention that such restriction was against public policy by pointing out that the rule subjecting a debtor's property to the payment of his debts 'does not give the creditor a right to complain that, in the exercise of his absolute right of disposition, the donor has not seen fit to give the property to the creditor, but has left it out of his reach.' " 134 N.J.Eq. at 439, 35 A.2d 874.

In the following paragraph, however, the Court clearly indicated its awareness that, regardless of the terms of a trust instrument, creditors may execute against income from a trust in excess of $18 per week:

"The public policy in this regard has been chartered by the Legislature by R.S. 2:26–182, N.J.S.A., dealing with the right of a judgment creditor to reach debts and income from trusts funds owing to the judgment debtor. By that statute the judgment creditor is precluded from proceeding by way of execution against any debt or any income from trust funds owing to the debtor which do not amount to $18 or more a week. The installments in the present case are well below the statutory minimum. While the statute referred to above is not involved in the present situation and more over is applicable only to involuntary alienation, nevertheless it is declarative of a public policy to safeguard a reasonable sum for sustenance from the hands of creditors. Cf. (*Harcum v. Greene, Cowan v. Storms, supra.*)" 134 N.J.Eq. at 435, 35 A.2d 874.

*Constanza v. Verona,* 48 N.J.Super. 355, 137 A.2d 614 (Ch.Div.1958), cited by SO-CAL, notes that "(s)pendthrift trusts have been recognized and enforced in this State," but does not address the question of whether the restriction on alienation is enforced only to the extent provided for by statute. The beneficiary was entitled to only $6.00 per week, and furthermore, because the beneficiary was an indigent patient in the Hudson County Hospital for Mental Diseases, the County was entitled to be paid for her support out of the income of the spendthrift trust.

New Jersey appears to treat pensions, however, as distinct from trusts. Two New Jersey decisions have held that pensions are exempt to a larger extent than that provided for by statute although, inexplicably, these cases have not referred to section 2A:17–50.

In *Seventy-First Street and Broadway Corp. v. Thorne,* 10 N.J.Misc. 99, 157A. 851 (S.Ct.1932), Justice Ackerson (who was then a judge of the Supreme Court) prohibited a creditor from attaching the debtor's pension income although the pension was being paid by a private company, no statute specifically exempted such pensions from attachment, and the amount of the pension was over $90 per week. The court relied on the contractual prohibition on assignment and "the present public policy of encouraging the establishment of old age retirement plans," explaining:

"(P)ublic policy should protect from dissipation *reasonable* pension funds created for the protection of low or medium salaried industrial employees in their old age, through the medium of contributions from a large class of such employees augmented by more substantial contributions from the employer." 10 N.J.Misc. at 106, 157 A. 851 (emphasis added).

The state's highest court followed *Seventy-First Street* in *Hoffman v. Hoffman,* 8 N.J. 157, 84 A.2d 441 (1951), refusing to allow execution against a $32 per week pension. In dictum, the court noted with approval the "American view" on the enforceability of spendthrift trust provisions, referring to the leading case of *Broadway National Bank v. Adams,* 133 Mass. 170 (1882). This dictum is probably the strongest support for SOCAL's claim that New Jersey recognizes spendthrift trusts as valid, but the court failed even to refer to Section 2A:17–50. The holding of Hoffman is best explained as an exception to section 2A:17–50 for pensions. (The primary holding of Hoffman, that pensions are not subject to a spouse's claim for support, was

overturned in *Thiel v. Thiel*, 41 N.J. 446, 197 A.2d 354 (1964); *see also Fischer v. Fischer*, 13 N.J. 162, 98 A.2d 568 (1953).) In addition, numerous statutes exempt from execution the pensions of public employees. *See Freedom Finance Co. v. Fleckenstein*, 116 N.J.Super. 428, 432, 282 A.2d 458 (D.Ct.1971).

It is not clear how New Jersey would treat the Debtor's Stock Plan and Savings Plan, which are payable in a lump sum upon retirement, nor is it clear how, if the pre-petition benefits were included in the estate, how the Trustee's interests would be measured and enforced against SOCAL. This discussion has revealed that the general spendthrift trust law of New Jersey would allow creditors to obtain up to 10% of the Debtor's income and would leave to the Debtor at least $48 per week of income, while the court-developed exemption for "reasonable" pensions would apparently completely exempt the Debtor's annuity plan from attachment. If section 541(c)(2) refers only to state law applicable to traditional spendthrift trust law, and if ERISA itself grants a superior federal exemption, it will then be necessary to determine to what law section 541(c)(2) directs the court.

*Federal Exemption Pursuant to ERISA*

Although many courts have interpreted ERISA to prohibit any type of attachment of benefits under ERISA-qualified plans, the language of the statute itself does not explicitly prohibit such attachment by creditors. ERISA requires only that the plan *"provide( )* that benefits provided under the plan may not be assigned or alienated; "* it does not by its own terms seem to prohibit such alienation or to establish the limitations on attachment. 29 U.S.C. § 1056(d). Much of the discussion of this question has concentrated on whether the provisions refer only to voluntary alienation or also to involuntary alienation. *E.g. General Motors Corp. v. Buha, infra.* This court does not doubt that the words "assigned or alienated" refer to alienation of all types, both voluntary and involuntary. The major question, then, is whether the statute was meant to create a federal

exemption for all pension plans governed by ERISA. Congress may simply have intended by the anti-alienation provision to require that plans include such prohibitory language, and to leave the interpretation of such language to state law, which normally governs the interpretation of trust provisions. In statutes governing pensions paid by the Federal Government, Congress has been much more explicit in providing a complete federal-law exemption for such pensions. E.g. 38 U.S.C. § 770(g) (Servicemen's Group Life Ins. Act) ("should not be liable to attachment, levy, or seizure by or under any legal or equitable process whatever, either before or after receipt by the beneficiary"); *see also* statutes quoted in *In re Goff*, 706 F.2d 574, 585 n. 29 (5th Cir.1983).

One of the few cases to have addressed this argument is *In re Graham*, 24 B.R. 305, 312 (Bankr.N.D.Iowa 1982), *aff'd*, 726 F.2d 1268 (8th Cir.1984), which explained:

"In (5 U.S.C. 8346), Congress has directly exempted the Civil Service Benefits from creditors. In contrast, ERISA only requires that the plan contain a restriction on alienation and assignment in order to qualify for ERISA tax benefits. *That requirement is not an exemption from creditors' process provided by federal law.* If Congress had intended that ERISA would provide such an exemption, a provision similar to the provision quoted above could have been enacted. The fact that they did not do so leads this Court to conclude that an ERISA fund is not within the exemption from the bankruptcy estate provided by other federal law under (section) 522(b)(2)(A)."

The great majority of courts have held or assumed that ERISA *does* create a federal exemption for pension benefits governed by ERISA, but none of these courts have clearly addressed the argument accepted by the bankruptcy court in *Graham*.

On appeal, although the Bankruptcy Court opinion in *In re Graham* was affirmed, the Court of Appeals assumed without analysis that ERISA section 206(d) and I.R.C. section 401(a)(13) "create a bar to

garnishment of qualified plan benefits by general commercial creditors of a beneficiary," citing *Buha* and *Commercial Mortgage, infra.* (The court held that the section 522(b)(2)(A) exemption for "any property that is exempt under Federal law" does not include the ERISA exemption). In *General Motors Corp. v. Buha*, 623 F.2d 455 (6th Cir.1980), a nonbankruptcy case, the court held that pension plan benefits are not subject to garnishment, relying primarily on the Treasury regulations, 26 C.F.R. 1.401(a)–13(b)(1), without considering the argument accepted by the bankruptcy court in *In re Graham. In re Goff, supra*, quoted the above passage from *In re Graham* with approval but did not take a position on the issue, holding only that if ERISA did provide a federal exemption for pension benefits, the exemption was not included in the section 522(b)(2)(A) exemption for "any property that is exempt under Federal law." The primary holding of *Goff*, in fact, was that section 541(c)(2) does not include ERISA within "applicable nonbankruptcy law;" this appears to depend on the assumption that ERISA itself does provide an exemption for pension benefits.

*In re Holt*, 32 B.R. 767, 771 (Bankr.E.D. Tenn.1983) acknowledged the uncertainty:

"Neither (26 C.F.R. section 1.401(a)–13) nor any provision of ERISA expressly forbids a creditor of a plan beneficiary from employing judicial proceeds to reach benefits to which his debtor is entitled under an ERISA plan. The regulation merely imposes a requirement for qualification of a plan for favorable tax treatment under 26 U.S.C.A. Section 401(a)(13) (1978). Consequently, there is a division of authority on the question of whether benefits under an ERISA plan may be subjected to judicial process. See Comment, *Attachment of Pension Benefits Under ERISA*, 74 Nw.U.L.Rev. 255 (1979)."

The court found the plan's restriction on alienation "enforceable under federal nonbankruptcy law: and excluded benefits from the estate." *See also Commercial Mortgage Ins. Inc. v. Citizens National Bank of Dallas*, 526 F.Supp. 510, 516 (N.D. Tex.1981).

A virtue of the reasoning in *In re Graham* is that its conclusions are consistent with the literal meaning of the statutory language. It overlooks, however, the very strong principle of state-law preemption evidenced by ERISA. The explicit preemption provisions in 29 U.S.C. § 1144(a), quoted *supra*, "demonstrates that Congress intended to depart from its previous legislation that 'envisioned the exercise of state regulation power of pension funds,' *Malone v. White Motor Corp.*, 435 U.S. 497, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978) (plurality opinion), and meant to establish pension plan regulation as exclusively a federal concern." *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 523, 101 S.Ct. 1895, 1906, 68 L.Ed.2d 402 (1981). If Congress had intended to subject all pensions to the various exemption provisions of the states in spite of the clear preemption provisions providing that ERISA "supersede(s) any and all State laws insofar as they may not or hereafter relate to" pensions, the statute would surely have done so explicitly. Indeed, ERISA does explicitly preserve state regulation of "insurance, banking or securities," 29 U.S.C. Section 1144(b)(2)(A), and "generally applicable criminal law(s) of a state," Section 1144(b)(2)(B)(4), but does not mention either exemption or attachment laws of the states. The anti-alienation provision of ERISA was thus intended to create a federal exemption for pensions.

The next issue is the proper extent of the ERISA exemption, which was discussed in *Commercial Mortgage Ins. Inc. v. Citizens National Bank of Dallas*, 526 F.Supp. 510, 516 (N.D.Tex.1981), a nonbankruptcy case:

There are two alternative bases upon which this Court could conclude that after the enactment of ERISA, federal law governs the garnishment of pension benefits. The first would be that the assignment-alienation prohibition in section 1056(d) and I.R.C. section 401(a)(13) creates a federal exemption of covered pension benefits from creditors' claims

which supersedes state law on the subject. In the alternative, the Court could determine that although these sections may not create a per se federal exemption, Congress nevertheless intended that ERISA supersede and preempt state laws governing the enforcement of creditors' claims as applied to pension benefits. Federal courts would be required under this theory to develop federal common law to govern such claims. After these points, ERISA and its legislative history, the Court has concluded that ERISA's general federal exemption of pension benefits from commercial creditors' claims and preempts otherwise relevant state law.

This court disagrees with the conclusion in *Commercial Mortgage* that the anti-alienation provision of ERISA creates a *per se* federal exemption for every ERISA-qualified pension. Numerous federal and state courts have found in various situations that ERISA-qualified plans are not exempt from the claims of creditors. *E.g. Ward v. Ward,* 164 N.J.Super. 354, 396 A.2d 365 (Ch.Div.1978) (not exempt from spouse's support claim); *cf. In re Graham,* 726 F.2d 1268 (8th Cir.1984) (benefits not exempt in bankruptcy); *In re Clark,* 711 F.2d 21 (3d Cir.1983) (Keogh plan benefits not exempt under section 522(d)(10)(E) of Bankruptcy Code); *see Raydon & Anderson, Attachment of Keogh Plan Assets—A Confusion in the Law and the Courts,* 61 Taxes 525 (1983). This is the best indication that a *per se* rule is neither intended nor appropriate, and the federal courts are developing a federal common law to govern the question. In this case the court finds no ground for granting less than a complete exemption pursuant to ERISA.

*Exclusion from the Estate under Section 541(c)(2)*

▬ Having concluded that New Jersey spendthrift trust law would exempt only the first $48 per week and 90% of the Debtor's income, that New Jersey pension law would exempt only a "reasonable" amount, and that ERISA provides a complete exemption, the court must determine the proper law to apply in this case. A number of courts have concluded that section 541(c)(2) of the Bankruptcy Code, which excludes from the estate trust funds which are not reachable by creditors in "applicable nonbankruptcy law," applies only to traditional spendthrift trusts rather than pensions. Most of these cases, however, involved pensions, IRA's and Keogh plans which would not have qualified as traditional spendthrift trusts. The leading case espousing this view is *In re Goff,* 706 F.2d 574 (5th Cir.1983), in which the court relied heavily on legislative history for its conclusions. *See also In re Graham,* 726 F.2d 1268 (8th Cir.1984) (holding that Section 541(c)(2) would not apply to any benefit plans within section 522(d)(10)(E)); *In re Turpin,* 644 F.2d 472 (5th Cir.1981) (pension not property of estate under section 70(a)(5) of Bankruptcy Act); *In re Threewitt,* 20 B.R. 434 (Bankr.D.Kan.1982), rev'd, 24 B.R. 927 (D.Kan.1982); *In re Klayer,* 20 B.R. 270 (Bankr.W.D.Ky.1981); *In re Watson,* 13 B.R. 391 (Bankr.M.D.Fla.1981).

The House Bill had excluded spendthrift trusts from the estate in their entirety in section 541(c)(2) and had also allowed the debtor to exempt from the estate the entire amount of the debtor's stock bonus, pension or similar plan in section 522(d)(10)(e). The Senate Bill had excluded spendthrift trusts from the estate only to the extent of the income reasonably necessary for the support of the Debtor and his dependents, and had adopted the applicable state exemptions rather than imposing a federal scheme as in the House Bill. The compromise bill which was adopted by the Conference Committee excluded spendthrift trusts from the estate in their entirety, as in the House Bill, but limited the section 522(d)(10)(E) exemption of stock bonus, pension and similar plans to the amount "reasonably necessary for the support of the debtor and any dependent of the debtor." The literal reading of the adopted provisions is that, while all spendthrift trusts are excluded from the estate to the extent they would be protected from creditors outside of bankruptcy, those pension plans and other similar plans which, for

whatever reason, *do not qualify as spend-thrift trusts* are nevertheless exempted to the extent necessary.

The House Report said:

The bill also continues over the exclusion from property of the estate of the debtor's interest in a spendthrift trust to the extent the trust is protected from creditors under applicable State law. The bankruptcy of the beneficiary should not be permitted to defeat the legitimate expectations of the settlor of the trust. H.R.Rep. No. 95–595 at 176 (1977), U.S. Code Cong. & Admin.News 1978, pp. 5787, 6136.

The Senate Report, accompanying S.2266, similarly explained that section 541(c)(2) "preserves restrictions on a transfer of a spendthrift trust … enforceable (under) nonbankruptcy law." S.Rep. No. 95–989 at 83 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5869. The *In re Goff* court therefore concluded that section 541(c)(2)'s reference to "applicable nonbankruptcy law" was intended to refer only to state spendthrift trust law.

*In re Goff* concluded, in other words, that although Congress had created a general federal exemption for pensions and eliminated the effect of state attachment and exemption statutes on pensions in 1974, Congress chose in the Bankruptcy Code of 1978 to revive the effect of state attachment and exemption statutes on pensions. This court finds this very unlikely in view of the great importance which the legislature had seen in relieving pension plans from state regulation. The Sixth Circuit Court of Appeals stated in *General Motors Corp. v. Buha, supra,*

"It is central to the statutory scheme that ERISA not be subject to state and local laws which might frustrate its goals. This was emphasized by Representative Dent, Chairman of the Subcommittee on Labor of the House Committee on Education and Labor, who stated:

Finally, I wish to make note of what is to many the crowning achievement of this legislation, the reservation to Federal authority the sole power to regulate the field of employee benefit plans. With the preemption of the field, we round out the protection afforded participants by eliminating the threat of conflicting and inconsistent state and local regulation. 120 Cong. Rec. 29197 (1974)." *General Motors Corp. v. Buha,* 623 F.2d 455, 459 (6th Cir.1980).

The reference of "applicable nonbankruptcy law" in section 541(c)(2) therefore referred to all law that might normally apply outside of bankruptcy proceedings, including ERISA. The Debtor's employee benefit plans are therefore excluded from the estate in their entirety.

Counsel for SOCAL shall submit an order consistent with this opinion.