In the Matter of Kosta P.
VELIS, Debtor.

Civ. A. No. 90–2217 (MTB).

United States District Court,
D. New Jersey.

Jan. 23, 1991.

498

Dechert, Price & Rhoads by Robert A. White, Princeton, N.J., for appellant Kosta P. Velis.

Teich, Groh and Frost by Allen I. Gorski, Trenton, N.J., for appellee Mary Kardanis.

## OPINION

BARRY, District Judge.

### I. INTRODUCTION

Appellant Kosta P. Velis a/k/a Konstantin P. Velis ("debtor") filed a voluntary Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of New Jersey on December 18, 1986. On January 26, 1988, appellee Mary Kardanis, who holds a multi-million dollar medical malpractice judgment against the debtor, filed an objection to his claimed exemption from the bankruptcy estate of his interest in the Konstantin P. Velis Pension Plan and Trust (the "Pension Plan"), the Konstantin P. Velis Keogh Plan (the "Keogh Plan"), and the Konstantin P. Velis Individual Retirement Account (the "IRA") [collectively the "Pension and Retirement Benefits"], asserting that these assets were not exempt under 11 U.S.C. § 522(d)(10)(E). In response, the debtor filed a cross-motion to dismiss the objection, claiming, in relevant part, that (1) the Pension and Retirement Benefits were excluded from the estate pursuant to 11 U.S.C. § 541(c)(2); and (2) the Pension and Retirement Benefits were exempt from the estate pursuant to 11 U.S.C. § 522(d)(10)(E).

The Honorable Daniel J. Moore, in an Opinion filed October 24, 1989, held that the Pension and Retirement Benefits were neither excluded nor exempt from the bankruptcy estate. *See In re Velis*, 109 B.R. 64 (Bankr.D.N.J.1989). More specifically, the court found that debtor's interest in the Pension Plan and the Keogh Plan is not excluded as property of the estate based upon "Debtor's and/or an insider's influence and control over same and based on the insignificant deterrence that imposition of an early withdrawal tax has on fund dissipation." 109 B.R. at 70. The IRA was not excluded because of debtor's ability to withdraw and, thus, control the entire fund on the date the bankruptcy petition was filed. *Id.* at 67–68. Finally, the court found that the Pension and Retirement Benefits were not needed to sustain the basic needs of debtor and his dependents and, thus, that those funds were not exempt from the property of the estate. *Id.* at 72. The order reflecting this decision was filed on November 9, 1989 and entered on November 17, 1989.

Debtor filed a timely Notice of Appeal on November 27, 1989. This court has jurisdiction over the appeal pursuant to 28

U.S.C. § 158(a). For the reasons that follow, Judge Moore's decision will be affirmed in its entirety.

## II. FACTS

Debtor is a sixty-six year old orthopedic surgeon employed by Doctor Konstantin P. Velis, P.C., a medical practice operating as a professional corporation ("PC") located at 420 East 72nd Street, New York, New York. Velis Dep., October 14, 1988 ("Velis Dep. II") at 4–5; Transcript of Motion Hearing before Bankruptcy Court on October 25, 1988 ("Tr.") at 4; see Tr. at 5. He is a 100% owner of the stock in the PC and is the only doctor that it employs. Velis Dep., August 13, 1987 ("Velis Dep. I"), at 14; Tr. at 43. The PC also employs debtor's wife as an office manager, and her functions include managing the Pension Plan and the Keogh Plan. 109 B.R. at 66; Velis Dep. II at 18; Tr. at 5. Debtor has a 24 year old daughter who is a third year law student, a 21 year old daughter who recently graduated from college, and a 19 year old son who recently graduated from high school. See 109 B.R. at 66; Tr. at 5–6.

In January 1980, the PC established the Pension Plan for the benefit of debtor, his wife and two other employees. Tr. at 44 & Exh. C (Konstantin P. Velis Pension Plan and Trust Agreement). In addition, the Keogh Plan and the IRA were created in the name of debtor and a separate Individual Retirement Account was created in the name of debtor's wife (the "Barbara Velis IRA"). See Velis Dep. I at 15; Tr. at 18. It is uncontested that the Pension Plan in which debtor has vested rights, the Keogh Plan and the IRA are qualified plans because each contains language prohibiting the assignment or alienation of benefits as required by section 401(a)(13) of the Internal Revenue Code, 26 U.S.C. § 401(a)(13), and section 206(d)(1) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1056(d)(1). On the date debtor filed his petition, his interest in the Pension Plan was valued at $184,-000.00, the Keogh Plan was valued at $162,478.00, and the IRA was valued at $9,100.00. 109 B.R. at 66; Rider to Schedule B-3(b). Debtor has claimed an exemption for the full amount of the Pension and Retirement Benefits pursuant to 11 U.S.C. § 522(d)(10)(E). Id.

On August 13, 1986, debtor and his wife entered into an agreement to purchase 857 shares of 420 East 72nd Street Tenants Corporation, representing an ownership interest in the two cooperative apartment units ("Co-ops") from which debtor conducts his medical practice (but in which he does not reside), for $775,000.00 and tendered a deposit of $77,500.00 from funds realized from the sale of a house in Seabright, New Jersey. 109 B.R. at 66; Velis Dep. I at 8, 15; Velis Dep. II at 35; Tr. at Exh. B (Order filed October 5, 1987 at ¶ 2). Debtor and his wife had obtained a financing commitment from Carteret Savings Bank for $620,000.00 toward the balance of the purchase price, but this commitment was withdrawn soon after appellee Kardanis won a $3.7 million medical malpractice judgment against debtor.[1] 109 B.R. at 66; Velis Dep. I at 35; Order filed October 5, 1987 at ¶ 4. Less than two months after the October 1986 malpractice judgment, the Chapter 11 petition was filed. The closing date on the sale of the Co-ops was adjourned until March 3, 1987 conditioned upon payment of an additional deposit of $222,500.00 by December 31, 1986. 109 B.R. at 66; Order filed October 5, 1987 at ¶ 4.

Having been unable to obtain financing from an institutional lender, debtor and his wife, without authorization of the Bankruptcy Court, withdrew $222,500.00 from the Pension Plan on or about December 30, 1986, and used that sum to make the deposit in a timely manner. 109 B.R. at 66; Velis Dep. I at 9, 12. Thereafter, debtor and his wife again withdrew without authorization from the Pension and Retirement Benefits to satisfy the balance of the purchase price at the closing, at which time they acquired title to the Co-ops as individ-

---

1. The October 22, 1986 judgment was subsequently reduced to $2.1 million, but debtor's malpractice insurance covered only $1 million. 109 B.R. at 66; see Velis Dep. II at 47.

uals. Velis Dep. I at 7; Velis Dep. II at 33; Tr. at 32; *see* Velis Dep. II at 35–36. In total, debtor and his wife withdrew $467,605.46 from the Pension Plan, $156,514.34 from the Keogh Plan, and $9,100.75 from the IRA, depleting those accounts; $33,713.07 from the Barbara Velis IRA, and approximately $33,500.00 from the PC. 109 B.R. at 66; Velis Dep. II at 35; Order filed October 5, 1987 at ¶ 7. At the time of the withdrawals, neither debtor nor his wife executed any form of promissory note, security agreement, mortgage or assignment of proprietary leases. *See* Velis Dep. I at 17. The Bankruptcy Court, by Order filed October 5, 1987, validated the financing of the balance of the purchase price from the Pension and Retirement Benefits in accordance with the terms and conditions of the Master Promissory Note and the Loan and Security Agreement without prejudice to the rights of the United States Trustee and/or appellee Kardanis to assert that the Pension and Retirement Benefits constitute property of debtor's estate. That order is not challenged here.

The combined gross income of debtor and his wife in 1987 was $330,000.00. Tr. at 31. Currently, debtor's income is $84,000.00 per year while his wife's income is $70,000.00 per year. 109 B.R. at 66; Velis Dep. I at 22; Velis Dep. II at 5, 19; Tr. at 20, 21. Although debtor anticipates that Bronx Lebanon Hospital, the hospital at which he sees patients and has operating privileges, will reduce his surgical sessions from one per week to one every two weeks due to his advancing age, such a reduction will amount to no lost income because his salary of approximately $15,000.00 per year from the hospital as well as his earnings from patient treatment at the hospital are deposited in the Pension Plan fund.[2] Velis Dep. I at 19–20; Tr. at 27, 39. The anticipated reduction in surgical sessions will only affect the Pension Plan fund to the extent that there will be a slight decrease in the already negligible Medicaid compensation from treatment of indigent patients. *See* Velis Dep. I at 20. Moreover, there is no indication that debtor's income from his Manhattan practice will decline in the near future and, indeed, debtor intends to continue working at least until his son has completed college. *Id.* at 22–23; Velis Dep. II at 44–45; Tr. at 20, 28, 30. Debtor's wife is only fifty years old and is capable of earning $70,000.00 per year regardless of whether she is employed by the PC. Tr. at 42; *see* Tr. at 5. In addition to income from employment, debtor and his wife are paid rent by the PC for the Co-ops in an amount between $2,000.00 and $3,000.00 per month which, like the hospital income, is placed in the Pension Plan fund. Velis Dep. II at 23–24; Tr. at 21.

Aside from the Co-ops, the most substantial asset of debtor and his wife is equity of approximately $400,000.00 in the marital home. *See* Schedule A–2. Separate and apart from debtor's Pension and Retirement Benefits is his wife's unspecified interest in the Pension Plan as well as the $33,713.07 from the Barbara Velis IRA which was borrowed to finance the purchase of the Co-ops. Velis Dep. II at 20; Tr. at 18–19. Debtor's wife also has a savings account with a balance below $25,000.00, although debtor himself has no unencumbered bank accounts. Velis Dep. I at 23–24; Velis Dep. II at 20, 21. Furthermore, debtor's wife owns a 1985 190 Mercedes while debtor has the use of a 1981 300 Mercedes owned by the PC. Velis Dep. II at 42; Tr. at 13, 41.

Debtor claims that total annual expenses for himself and his family amount to $91,590.00. Debtor's Proposed Findings of Fact and Conclusions of Law ("Debtor's Factual Findings") at ¶ 12. The household expenses, attributable primarily to debtor and his wife, are summarized as follows:

---

**2.** Debtor also operates at New York Hospital and at Manhattan Eye and Ear Hospital, but the amount of income that he receives from these sources and its ultimate disposition is not detailed. *See* Velis Dep. II at 30–31; Tr. at 4.

| | | Monthly | Yearly |
|---|---|---|---|
| (1) | Mortgage/Real Estate Taxes | $1,085.00 | $13,020.00 |
| (2) | Home Insurance | | $ 350.00 |
| (3) | Gas/Electric | $ 160.00 | $ 1,920.00 |
| (4) | Heat | $ 170.00 | $ 2,040.00 |
| (5) | Home Maintenance (Lawn Care, Snow Removal and Repairs) | $ 200.00 | $ 2,400.00 |
| (6) | Telephone | $ 120.00 | $ 1,440.00 |
| (7) | Food for Debtor, Wife and Children | $ 800.00 | $ 9,600.00 |
| (8) | Clothing for Debtor and Wife | $ 200.00 | $ 2,400.00 |
| (9) | Medical Care for Debtor, Wife and Children | $ 200.00 | $ 2,400.00 |
| (10) | Political Contributions and Contributions to Medical Societies | $ 100.00 | $ 1,200.00 |
| (11) | Gifts for Birthdays and Christmas | $ 170.00 | $ 2,040.00 |
| (12) | Vacation (2–3 Weeks) | | $ 2,400.00 |
| (13) | Entertainment | $ 170.00 | $ 2,040.00 |
| | | | $43,250.00 |

*Id.* at ¶ 12; Velis Dep. II at 6–13; Tr. at 6–13. In addition to the $43,250.00 in household expenses, debtor claims $48,340.00 in annual tuition and living expenses for his three children: $17,820.00 for his eldest daughter, $14,000.00 for his younger daughter, and $16,520.00 for his son. Debtor's Findings of Fact at ¶ 12; Velis Dep. II at 13–18; Tr. at 13–16.

## III. DISCUSSION

■ The property of an estate is broadly defined as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Nevertheless, the Bankruptcy Code explicitly excludes certain interests in trusts from the bankruptcy estate.

A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title.

11 U.S.C. § 541(c)(2). Therefore, as long as "applicable nonbankruptcy law" enforces a restriction on the transfer of a debtor's interest in a trust, that interest will be excluded from the bankruptcy estate.

■ The overarching question here is the meaning of "applicable nonbankruptcy law." Debtor asserts that "applicable nonbankruptcy law" includes ERISA and, consequently, that his interest in the Pension Plan, the Keogh Plan and the IRA are excluded from the bankruptcy estate by virtue of compliance with 29 U.S.C. § 1056(d)(1), the anti-alienation provision of ERISA. Appellee, on the other hand, asserts that "applicable nonbankruptcy law" does not include ERISA, but, rather, is narrowly limited to state spendthrift trust law. I reject debtor's assertion, and find that Congress intended "applicable nonbankruptcy law" to encompass only state spendthrift trust law.

Although the Court of Appeals for the Third Circuit has not yet addressed the meaning of "applicable nonbankruptcy law" as that phrase is used in § 541(c)(2), the strong weight of judicial authority supports the view that it is synonymous with state spendthrift trust law. Four of the five circuits which have considered the issue have held that "applicable nonbankruptcy law" encompasses only state spendthrift trust law. *See Daniel v. Security Pacific Nat'l Bank (In re Daniel)*, 771 F.2d 1352, 1360 (9th Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1199, 89 L.Ed.2d 313 (1986); *Lichstrahl v. Bankers Trust (In re Lichstrahl)*, 750 F.2d 1488, 1490 (11th Cir.1985); *Samore v. Graham (In re Graham)*, 726 F.2d 1268, 1273 (8th Cir. 1984); *Goff v. Taylor (In re Goff)*, 706 F.2d 574, 580 (5th Cir.1983); *but see Anderson v. Raine (In re Moore)*, 907 F.2d 1476, 1477 (4th Cir.1990). Likewise, the majority of bankruptcy judges in this circuit read "applicable nonbankruptcy law" narrowly. *See In re Atallah*, 95 B.R. 910, 915 (Bankr.

E.D.Pa.1989); *In re Hysick*, 90 B.R. 770, 773 (Bankr.E.D.Pa.1988); *In re Heisey*, 88 B.R. 47, 51 (Bankr.D.N.J.1988); *White v. Babo (In re Babo)*, 81 B.R. 389, 391 (Bankr. W.D.Pa.1988); *B.K. Medical Systems Pension Plan v. Roberts (In re Roberts)*, 81 B.R. 354, 374 (Bankr.W.D.Pa.1987); *but see Bentz v. Sawdy (In re Sawdy)*, 49 B.R. 383, 386 (Bankr.W.D.Pa.1985); *Liscinski v. Mosley (In re Mosley)*, 42 B.R. 181, 191 (Bankr.D.N.J.1984). I am similarly persuaded.

■■■ Construction of a statute must begin with that statute's language. *Mallard v. United States District Court for the Southern District of Iowa*, 490 U.S. 296, 299–300, 109 S.Ct. 1814, 1817, 104 L.Ed.2d 318 (1989); *Heverly v. Comm'r of Internal Revenue*, 621 F.2d 1227, 1232 (3d Cir.1980), *cert. dismissed*, 451 U.S. 1012, 101 S.Ct. 2351, 68 L.Ed.2d 865 (1981). A fundamental canon of statutory construction is that unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning. *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). The phrase "applicable nonbankruptcy law" as used in § 541(c)(2) is not defined there or elsewhere in the Bankruptcy Code. The two common meanings of "applicable," the key word in that phrase, are "capable of being applied: having relevance" and "fit, suitable, or right to be applied: appropriate." *Webster's Third New Int'l Dictionary* 105 (1979). Within the context of the remainder of subsection (c)(2), "applicable nonbankruptcy law" thus translates to nonbankruptcy law relevant to or appropriate for the enforcement of a restriction of a debtor's interest in a trust, an interpretation that only exacerbates its unintelligibility. Recourse to the common meaning of the phrase "applicable nonbankruptcy law" in § 541(c)(2) does not resolve the inherent ambiguity generated by the word "applicable," and certainly does not, as debtor nonetheless contends, suggest synonymity with "any nonbankruptcy law." Br. at 20.

Where the statutory language in unclear, a court will look to the legislative history of the statute. *Blum v. Stenson*, 465 U.S.

886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984); *In re Roach*, 824 F.2d 1370, 1372 (3d Cir.1987). The legislative history of § 541(c)(2) reveals a clear intent by Congress to limit the phrase "applicable nonbankruptcy law" to state spendthrift trust law. Section 70(a)(5) of the former Bankruptcy Act dictated that the trustee of the bankruptcy estate was vested with the title of the bankrupt in all property which, prior to the filing of the petition, he or she could have transferred by any means or which was subject to levy and subsequent sale by judicial process, or otherwise seized, impounded or sequestered. 11 U.S.C. § 110(a)(5) (repealed 1978). The principal function of this section of the Act was "to secure for creditors everything of value the bankrupt may possess in alienable or leviable form when he file[d] his petition." *Segal v. Rochelle*, 382 U.S. 375, 379, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 (1966). Nevertheless, this transferability-leviability standard was tempered by state exemptions which it was the policy of the Bankruptcy Act to respect. *Eaton v. Boston Safe Deposit & Trust Co.*, 240 U.S. 427, 429, 36 S.Ct. 391, 392, 60 L.Ed. 723 (1916); *First Northwestern Trust Co. v. Internal Revenue Service*, 622 F.2d 387, 391 (8th Cir.1980). Accordingly, to the extent that state law recognized the validity of a spendthrift trust provision, thereby protecting the bankrupt's interest in the trust from transfer or levy, title to this interest did not vest in the bankruptcy trustee. *First Northwestern Trust Co.*, 622 F.2d at 391; *Stebbins v. Crocker Citizens Nat'l Bank (In re Ahlswede)*, 516 F.2d 784, 786 (9th Cir.), *cert denied*, 423 U.S. 913, 96 S.Ct. 218, 46 L.Ed.2d 142 (1975).

Despite other fundamental changes wrought by the Bankruptcy Code, Congress clearly intended that § 541(c)(2) perpetuate the treatment of spendthrift trusts under § 70(a)(5) of the Bankruptcy Act. The House report accompanying H.R. 8200, the Bankruptcy Reform Act of 1978, summarizes the effect of the bill on the determination as to what constitutes property of the bankruptcy estate in these words:

The bill makes significant changes in what constitutes property of the estate. * * *

The bill determines what is property of the estate by a simple reference to what interests the debtor has at the commencement of the case. This includes all interests, such as interests in real or personal property, tangible and intangible property, choses in action, causes of action, rights such as copyrights, trademarks, patents, and processes, contingent interests and future interests, whether or not transferable by the debtor. The bill continues over the inclusion of property in the estate of certain property acquired by the debtor within six months after the commencement of the case, but expands the categories to include life insurance benefits and divorce or alimony settlements. *The bill also continues over the exclusion from property of the estate of the debtor's interest in a spendthrift trust to the extent the trust is protected from creditors under applicable State law.*[3]

H.R.Rep. No. 95–595, 95th Cong., 2d Sess., 175–76 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6136 (emphasis added).

First and foremost, the plain language of the last sentence of this passage coupled with the citation to proposed 11 U.S.C. § 541(c)(2) provides the unequivocal link of synonymity between "applicable State [spendthrift trust] law" and "applicable nonbankruptcy law." Moreover, examination of this sentence in context dispels any notion that "continues over" connotes anything other than its common meaning. It is clear that the first half of the second paragraph is devoted to highlighting the "significant changes" in the concept of property of the estate, while the last two sentences of that paragraph provide reassurance of continuity with the Bankruptcy Act. Indeed, it is significant to note that continuation of the inclusion of certain property acquired by the debtor within six months of filing the petition is coupled with an explicit reference to an expansion of its scope, whereas the perpetuation of the treatment of a debtor's interest in a spendthrift trust is not so qualified. *See N.J. Policemen's Benevolent Ass'n Local 304 v. New Jersey Transit Corp.*, 806 F.2d 451, 456 (3d Cir.1986) (abandonment of congressionally articulated policy generally not assumed in absence of some expression by Congress that abandonment is intended), *cert. denied*, 483 U.S. 1006, 107 S.Ct. 3230, 97 L.Ed.2d 736 (1987). Therefore, from the plain language of the House report summary concerning property of the estate and the accompanying contextual implications, the inescapable conclusion is that the House intended an uninterrupted continuation of the treatment of interests in spendthrift trusts under the Bankruptcy Code.

---

**3.** In a footnote to this statement, the House Report cites proposed 11 U.S.C. § 541(c)(2) and draws support by analogy from the Report of the Commission on the Bankruptcy Laws of the United States, H.R.Doc. No. 93–139, 93d Cong., 1st Sess., pt. I, at 197–98 (1973), *reprinted in*, 2 Collier on Bankruptcy (Appendix) I–1, 197–98 (15th Ed.1982). The Commission's draft statute served as the basis for the Bankruptcy Reform Act of 1978. 2 Collier on Bankruptcy (Appendix) I–1 (15th Ed.1982). The Commission's Report with respect to spendthrift trusts further supports the intent of the House of Representatives to restrict § 541(c)(2) to state spendthrift trust law:

5. Spendthrift Trusts
Under the existing Act, the trustee does not succeed to beneficial interests subject to spendthrift restraints. This is so since the present Act requires that the interests be alienable or amenable to creditor's process under local law and, by definition, such interests are not. There is no sound justification for permitting a debtor to take advantage of the Bankruptcy Act and, at the same time, to shield from his creditors assets because local law does not allow creditors to reach his interest. The Commission generally recommends that these restraints are not enforceable. However, in recognition of the possibility that the spendthrift trust may be used to protect one incapable of providing for his own welfare, the debtor should be allowed to retain sufficient income to support himself and his dependents. But to the extent the beneficial interest is of a value in excess of the reasonable support needs of the debtor and his dependents, the interest should be available to the debtor's creditors.
H.R.Doc. No. 93–139, *supra*, at 197–98, *reprinted in*, 2 Collier on Bankruptcy (Appendix) I–1 at 197–98.

This legislative intent is bolstered by the particular references to proposed section 541(c)(2) in the corresponding House and Senate reports.

Subsection (c) [of section 541] invalidates restrictions on the transfer of property of the debtor, in order that all of the interests of the debtor in property will become property of the estate. * * * Paragraph (2) of subsection (c), however, preserves restrictions on transfer of a spendthrift trust to the extent that the restriction is enforceable under applicable nonbankruptcy law.

H.R.Rep. No. 95–595, *supra*, at 369, *reprinted in,* 1978 U.S.Code Cong. & Admin. News at 6325. The comparable section in the Senate report, which is almost identically worded, also explains that § 541(c)(2) "preserves restrictions on a transfer of a spendthrift trust [where] the restriction is enforceable [under] nonbankruptcy law." S.Rep. No. 95–989, 95th Cong., 2d Sess., 83 (1978), *reprinted in,* 1978 U.S.Code Cong. & Admin.News 5787, 5869. These precise references to § 541(c)(2) further elucidate the clear intent of Congress to simply "preserve," rather than enlarge, the recognized exception for spendthrift trusts under the Bankruptcy Act. *See N.J. Policemen's Benevolent Ass'n, supra,* 806 F.2d at 456. Thus, the legislative history of § 541(c)(2) unequivocally supports the view that "applicable nonbankruptcy law" refers only to state spendthrift trust law.

The cases upon which debtor principally relies in support of his position that "applicable nonbankruptcy law" includes ERISA are universally plagued with analytical shortcomings. For ease of reference, these cases are generally divisible into two groups based upon the line of reasoning employed. The cases in the first group, *In re Moore, supra; Warren v. G.M. Scott & Sons (In re Phillips),* 34 B.R. 543 (Bankr.S. D.Ohio 1983); and *In re Pruitt,* 30 B.R. 330 (Bankr.D.Colo.1983) [collectively the "*Moore* group"], incorrectly presume that the phrase "applicable nonbankruptcy law" in § 541(c)(2) clearly on its face embraces ERISA and *In re Moore* itself alternatively misapplies settled rules of statutory construction and perfunctorily reviews the legislative history of § 541(c)(2). The cases in the second group, *In re Ralstin,* 61 B.R. 502 (Bankr.D.Kan.1986); *Nachman v. Diaz (In re Diaz),* 50 B.R. 22 (Bankr.E.D.Va. 1985); *In re Mosley, supra; In re Phillips, supra; Clotfelter v. Ciba–Geigy Corp. (In re Threewitt),* 24 B.R. 927 (D.Kan.1982); and *In re Rogers,* 24 B.R. 181 (Bankr.D. Ariz.1982) [collectively the "*Ralstin–Threewitt* group"], fail even to address the meaning of "applicable nonbankruptcy law," opting instead to examine the legislative history of ERISA, the public policy behind ERISA, and a body of case law purporting to hold that a debtor's interest in ERISA-qualified pension and retirement benefits is beyond the reach of his or her general creditors. I will consider each group of cases in turn.

With regard to the *Moore* group of cases, I need not belabor the point that, in fact, the meaning of the phrase "applicable nonbankruptcy law" in § 541(c)(2) is ambiguous. *See supra* at 503–504. However, the unique and more detailed reasoning in *In re Moore* itself is particularly troubling because of its deceptive appeal, thereby meriting a more thorough analysis.

Initially, I am struck by the *Moore* court's twisting of the rules of statutory construction. In an effort to have its cake and eat it, too, the *Moore* court begins by finding that the "plain language" of "applicable nonbankruptcy law" in § 541(c)(2) includes "all laws, state and federal, under which a transfer restriction is enforceable," 907 F.2d at 1477, properly noting that recourse to secondary sources of congressional intent would consequently be inappropriate, *id.* at 1478–79, yet thereafter attempts to bolster its reading of the "plain language" of § 541(c)(2) by delving into parole evidence of congressional intent, material that it had just determined would be inappropriate to consider. *Id.* at 1477–78. Moreover, the *Moore* court's recourse to secondary sources of congressional intent focuses not upon the highly relevant and authoritative legislative history of § 541(c)(2), the statute at issue, but, rather, upon a comparison of § 541(c)(2) to other

unrelated provisions of the Bankruptcy Code.

Even if the *Moore* court's attempt to divine congressional intent had been a proper effort at statutory construction, the results are singularly unpersuasive. The *Moore* court first concludes that because the phrase "applicable nonbankruptcy law" as used in two provisions of the Bankruptcy Code other than § 541(c)(2) has been judicially interpreted to encompass federal as well as state law, use of that phrase in § 541(c)(2) must also include federal law in addition to state spendthrift trust law due to the presumption that the same words in different sections of a law are given the same meaning. *Id.* The primary difficulty with this conclusion is that the phrase "applicable nonbankruptcy law" is not a term of art capable of uniform meaning, but, rather, is a ubiquitous catchall phrase[4] that is statute-specific due to use of the qualifying adjective "applicable." Consequently, intra-statutory comparison for the purpose of interpretation of the phrase "applicable nonbankruptcy law" is meaningless. Correspondingly, the *Moore* court's additional conclusion that Congress did not intend § 541(c)(2) to include only state law because it had manifested such an intent elsewhere in the Bankruptcy Code through explicit reference to state law is irrelevant due to the absence of any attempt to interpret "applicable nonbankruptcy law" as used in § 541(c)(2). *See id.* at 1478.

Moreover, when the *Moore* court addresses the legislative history of § 541(c)(2), albeit only to show that it is inconclusive in divining congressional intent with regard to the meaning of "applicable nonbankruptcy law," and concludes that, at most, it suggests that Congress meant state spendthrift trust law to be included within, but not to exclusively comprise, "applicable nonbankruptcy law," *id.* at 1479, the analysis is superficial. The *Moore* court not only discounts the significance of the plain language of the reference to interests in state spendthrift trusts contained in the summary of the House report concerning property of the estate, but also neglects a crucial examination of that language in the context of the preceding text of that summary section. *See supra* at 505–506. Furthermore, the *Moore* court completely ignores the illuminating spendthrift trust section of the Report of the Commission on the Bankruptcy Laws of the United States. *See supra* note 3. Therefore, any determination as to the conclusiveness of the legislative history of § 541(c)(2) based upon such a selective review is worth very little.

The cases in the *Ralstin–Threewitt* group suffer from a more fundamental flaw than those in the *Moore* group because of their failure even to recognize and address the central issue—the meaning of the phrase "applicable nonbankruptcy law" as used in § 541(c)(2). Certain of those cases wax eloquent in a wholly irrelevant review of the legislative history of ERISA or the public policy behind ERISA. *See In re Ralstin, supra,* 61 B.R. at 504; *In re Diaz, supra,* 50 B.R. at 22–23. Nevertheless, the common denominator in all of those cases is citation to a body of case law, most representative of which is *Tenneco Inc. v. First Virginia Bank of Tidewater,* 698 F.2d 688, 690 (4th Cir.1983) and *General Motors Corp. v. Buha,* 623 F.2d 455, 463 (6th Cir.1980), in support of the proposition that a debtor's interest in ERISA-qualified pension and retirement benefits is beyond the reach of his or her general creditors.[5] Those cases, however, hold that ERISA-qualified pension and retirement benefits are not subject to garnishment by a commercial or third-party

---

4. The phrase "applicable nonbankruptcy law" is utilized throughout the Bankruptcy Code in a total of fifteen provisions: 11 U.S.C. § 101, 11 U.S.C. § 108, 11 U.S.C. § 363, 11 U.S.C. § 365, 11 U.S.C. § 510, 11 U.S.C. § 522, 11 U.S.C. § 524, 11 U.S.C. § 541, 11 U.S.C. § 552, 11 U.S.C. § 927, 11 U.S.C. § 943, 11 U.S.C. § 1123, 11 U.S.C. § 1125, 11 U.S.C. § 1126, and 11 U.S.C. § 1142.

5. In a slight, and analytically inconsequential, variation on the theme, *In re Mosley* cites language in *General Motors Corp. v. Buha* declaring that a primary goal of the ERISA statutory scheme was to avoid subjecting pension and retirement benefit issues to potentially conflicting and inconsistent state and local regulations. *In re Mosley, supra,* 42 B.R. at 191.

creditor. *Id.* No reference is made to the treatment of an ERISA-qualified plan under the Bankruptcy Code. *Id.*

Moreover, despite the potential for friction between ERISA and the Bankruptcy Code with regard to the treatment of pension and retirement benefits, the statutes are compatible. Section 514(d) of ERISA provides that

> [n]othing in this [Act] shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States [except pre-existing federal pension and retirement benefit law] or any rule or regulation issued under any such law.

29 U.S.C. § 1144(d). This statutory provision leaves no doubt that "ERISA was not intended to affect the operation of other federal laws including federal bankruptcy laws. If a distinction is created by operation of bankruptcy law, which might conflict with ERISA, bankruptcy law prevails." *In re Goff, supra,* 706 F.2d at 589; *accord Levine v. Central States, Southeast & Southwest Areas Pension Fund (In re Ottawa Cartage, Inc.),* 55 B.R. 371, 377–78 (N.D.Ill.1985). For this reason as well, reliance upon the *Ralstin–Threewitt* group of cases is misplaced.

■ In summary, it is clear that while the meaning of the phrase "applicable nonbankruptcy law" in § 541(c)(2) is ambiguous, the legislative history unmistakably reveals a congressional intent to circumscribe the scope of that language to state spendthrift trust law. Accordingly, the Pension Plan, the Keogh Plan, and the IRA are excluded from the debtor's estate only to the extent that they would be protected from creditors under local spendthrift trust law. Thus, I turn my attention to the principles of New Jersey spendthrift trust law.

■ A spendthrift trust is "[a] trust in which by the terms of the trust or by statute a valid restraint on the voluntary and involuntary transfer of the interest of the beneficiary is imposed...." *Restatement (Second) of Trusts* § 152(2). Spendthrift trusts are designed to provide a fund for the maintenance of the beneficiary as well as to protect the beneficiary against his or her improvidence or incapacity by placing the fund beyond the reach of creditors. *Black's Law Dictionary* 1256 (5th ed.1979). As a general rule, New Jersey recognizes and enforces spendthrift trusts. *Constanza v. Verona,* 48 N.J.Super. 355, 359, 137 A.2d 614 (Ch.Div.1958).

New Jersey spendthrift trust law, however, draws a sharp distinction between its treatment of a self-settled trust with a spendthrift provision, *i.e.* a spendthrift trust created by a settlor for his or her own benefit, and a spendthrift trust created by a settlor for another person, generally a trust established for an employee by an employer. An employer-created spendthrift trust is protected from attachment by creditors of the employee/beneficiary. *Hoffman v. Hoffman,* 8 N.J. 157, 161, 84 A.2d 441 (1951). On the other hand,

> [t]he right of any creator of a trust to receive either the income or the principal of the trust or any part of either thereof, presently or in the future, shall be freely alienable and shall be subject to the claims of his creditors, notwithstanding any provision to the contrary in the terms of the trust.

N.J.S.A. 3B:11–1; *accord* N.J.S.A. 25:2–1; *see also* N.J.S.A. 2A:17–57.

■ Acknowledging this unequivocal legislative sentiment against protection for self-settled spendthrift trusts, the Superior Court of New Jersey recently embraced section 156(1) of the Restatement (Second) of Trusts which provides that

> [w]here a person creates for his own benefit a trust with a provision restraining the voluntary or involuntary transfer of his interest, his transferee or creditors can reach his interest.

*Aronsohn & Springstead v. Weissman,* 230 N.J.Super. 63, 68, 552 A.2d 649 (App. Div.), *cerif. denied,* 117 N.J. 36, 563 A.2d 808 (1989). The *Aronsohn* court reasoned that there is a "strong policy that will prevent any person from placing his property in what amounts to a revocable trust for his own benefit which would be exempt from the claims of his creditors." *Id.* at 70, 552 A.2d 649 (quoting *In re Goff, su-*

*pra,* 706 F.2d at 588). In sum, New Jersey spendthrift trust law dictates that an employer-created spendthrift trust may not be reached by the employee/beneficiary's creditors whereas a self-settled spendthrift trust is not similarly protected.

While the Keogh Plan and the IRA are, by their very nature, self-settled trusts, the Pension Plan is technically an employer-created spendthrift trust because it was established by Doctor Konstantin P. Velis, PC, an employer, for the benefit of, *inter alia,* Konstantin P. Velis, its employee. It is well settled that a shareholder is an entity separate and apart from the corporation in which he or she holds equity. *State of New Jersey, Dep't of Envtl. Protection v. Ventron Corp.,* 94 N.J. 473, 500, 468 A.2d 150 (1983). The fact that debtor is the sole shareholder in the PC is not sufficient, in and of itself, to disregard the corporate identity. *Coppa v. Taxation Div. Director,* 8 N.J.Tax 236, 245 (1986).

Nevertheless, where a corporation is an alter ego of its shareholders to the extent that (1) the shareholders' disregard of the corporate entity made it a mere instrumentality for the transaction of their own affairs; (2) there is such a unity of interest and ownership that the separate personalities of the corporation and its owners no longer exist; and (3) adherence to the doctrine of the corporate entity would promote injustice or protect fraud, the corporate identity will be deemed a fiction and disregarded. *Coppa, supra,* 8 N.J.Tax at 245; *Fletcher Cyc. Corp.* § 41.10 (Perm.ed.1990). The party crying "fiction" bears the burden of persuasion. *Dep't of Labor v. Berlanti,* 196 N.J.Super. 122, 127, 481 A.2d 830 (App.Div.1984), *certif. granted,* 99 N.J. 151, 491 A.2d 666 (1984), *appeal dismissed,* 101 N.J. 568, 503 A.2d 846 (1985).

If ever a corporation has been co-opted by and rendered indistinguishable from its owner, it is Doctor Konstantin P. Velis, P.C. As a direct consequence of his complete and total ownership of the PC, debtor was able to convert hundreds of thousands of dollars of deferred income that had been sheltered from taxation by the PC as well as general assets of the PC into liquid assets for his immediate and sole use. In effect, as Judge Moore noted, the Pension Plan, the Keogh Plan and the IRA stopped serving as deferred income plans and assumed the status of a lending institution for debtor's benefit. Tr. at 25–26. Less than two weeks after filing his voluntary bankruptcy petition, debtor, without even advising the Bankruptcy Court much less obtaining its approval, borrowed $222,500.00 from the Pension Plan—a sum, I note, that exceeded his total interest in the plan—without posting any form of security whatsoever. Debtor then struck again to obtain approximately $478,-000.00 more in unsecured funds for the closing on the Co-ops. In the process, he not only siphoned off even more of the funds in the Pension Plan and depleted the Keogh Plan and the IRA, but also encouraged his wife to borrow, to the point of depletion, against the Barbara Velis IRA and, when that was not enough, borrowed other assets of the PC to make up the difference. In return for this effort, debtor and his wife, rather than the PC, acquired title to the Co-ops.

Under the circumstances, it would indeed be a grave injustice to countenance the fiction that the PC is an independent entity with the consequence of shielding debtor's interest in the Pension Plan from a creditor who holds a medical malpractice judgment against him. Moreover, slavish adherence to form over substance would make a mockery of ERISA which was promulgated to protect pension and retirement benefits rather than shelter monies to be used at one's whim for real estate investments. As Judge Moore observed, "The act of withdrawal for a purpose other than retirement"—a purpose, I note, which is consistent, rather, with continued employment—"and the risks of repayment inherent thereto are inconsistent with the preservation of retirement funds at the heart of ERISA as well as the strict provisions of ERISA relating to prohibited transactions (29 U.S.C. § 1108)." 109 B.R. at 70. Judge Moore correctly determined that the Pension Plan, the Keogh Plan and the IRA are self-set-

tled spendthrift trusts and, therefore, that the Pension and Retirement Benefits are not shielded from debtor's creditors under New Jersey spendthrift trust law but, rather, are included in the bankruptcy estate.

■■■ Although the Pension Plan, the Keogh Plan and the IRA are property of the estate, the Bankruptcy Code nevertheless exempts pension and retirement benefits that meet certain conditions. More specifically, an exemption is provided for

[t]he debtor's right to receive … a payment under a stock bonus, pension, profitsharing, annuity, or similar plan or contract on account of illness, disability, death, age or length of service, to the extent reasonably necessary for the support of the debtor and any dependents of the debtor, unless—

(i) such plan or contract was established by or under the auspices of an insider that employed the debtor at the time the debtor's rights under the plan or contract arose;

(ii) such payment is on account of age or length of service; and

(iii) such plan or contract does not qualify under section 401(a), 403(a), 403(b), 408, or 409 of the Internal Revenue Code of 1954 (26 U.S.C. 401(a), 403(a), 403(b), 408, or 409).

11 U.S.C. § 522(d)(10)(E). The burden is upon the party objecting to a § 522(d) exemption to establish by a preponderance of the evidence that the exemption should be disallowed. *In re Magnus*, 84 B.R. 976, 978 (Bankr.E.D.Pa.1988); *In re Woodford*, 73 B.R. 675, 679 (Bankr.N.D.N.Y.1987). Furthermore, exemptions are construed liberally in favor of the debtor. *In re Magnus*, 84 B.R. at 978; *In re Fisher*, 63 B.R. 649, 651 (Bankr.W.D.Ky.1986).

■■■ Initially, a § 522(d)(10)(E) exemption is applicable only where a debtor has a present, as opposed to a future, right to receive the pension and retirement benefits at issue. *Clark v. O'Neill (In re Clark)*, 711 F.2d 21, 23 (3d Cir.1983). It is irrelevant whether a debtor is actually receiving the benefits as long as he or she has the present right to receive them. *Parkinson v. Bradford Trust Co. (In re*

*O'Brien)*, 50 B.R. 67, 77 (Bankr.E.D.Va. 1985) (interpreting *In re Clark, supra*); *see In re Clark, supra*, 711 F.2d at 23; *contra* 109 B.R. at 71–72. Appellee concedes that debtor, at age sixty-six, enjoys a present right to receive his interest in the Pension Plan, the Keogh Plan and the IRA. Appe.Br. at 10. Consequently, debtor's recourse to § 522(d)(10)(E) will not be foreclosed on the basis that he is not currently receiving the Pension and Retirement Benefits.

■■■ That, of course, does not conclude the inquiry; rather, a determination must be made as to whether all three subsections of § 522(d)(10)(E) have been satisfied. Appellee contends that § 522(d)(10)(E) is inapplicable where subsection (i), subsection (ii) *or* subsection (iii) is satisfied. This contention lacks merit in that it both ignores the word "and" and, probably for that reason, has absolutely no basis in the legislative history. The word "and" is to be accorded its normal conjunctive connotation, rather than treated as a synonym for the word "or," unless such strict grammatical construction would frustrate clear legislative intent. *Bruce v. First Federal Sav. and Loan Ass'n*, 837 F.2d 712, 715 (5th Cir.1988). Because the Pension Plan, the Keogh Plan and the IRA are qualified under 26 U.S.C. § 401(a) and, thus, fail to satisfy § 522(d)(10)(E)(iii), they are exempt property in an amount reasonably necessary to support debtor and his dependents.

■■ Although the phrase "to the extent reasonably necessary for … support" in § 522(d)(10)(E) is not statutorily defined, Congress clearly intended its scope to be limited to subsistence, rather than broadened, as debtor contends, to encompass lifestyle maintenance. Such a construction inescapably follows from the discussion of exemption provisions in the House report on H.R. 8200 which notes that

[t]he historical purpose of [ ] exemption laws has been to protect a debtor from his creditors, to provide him with the basic necessities of life so that even if his creditors levy on all of his nonexempt

property, the debtor will not be left destitute and a public charge. [This] purpose has not changed....

H.R.Rep. No. 95–595, *supra,* at 126, *reprinted in,* 1978 U.S.Code Cong. & Admin. News at 6087. Accordingly, it has been said, persuasively in my view, that

> the reasonably necessary standard requires that the court take into account other income and exempt property of the debtor, present and anticipated, ... and that the appropriate amount to be set aside for the debtor ought to be sufficient to sustain basic needs, not related to his former status in society or the lifestyle to which he is accustomed but taking into account the special needs that a retired and elderly debtor may claim.

*Warren v. Taff (In re Taff),* 10 B.R. 101, 107 (Bankr.D.Conn.1981); *accord In re Kochell,* 732 F.2d 564, 566 (7th Cir.1984); *see In re Clark, supra,* 711 F.2d at 23.

 A determination of the basic needs of a debtor and his or her dependents necessarily includes, at a minimum, consideration of (1) debtor's present and anticipated living expenses; (2) debtor's present and anticipated income from all sources; (3) the age of the debtor and his or her dependents; (4) the health of debtor and his or her dependents; (5) debtor's ability to earn a living; (6) debtor's job skills, training and education; (7) debtor's other assets, including exempt assets; (8) the liquidity of these other assets; (9) debtor's ability to save for retirement; (10) the special needs of the debtor and his or her dependents; and (11) debtor's continuing financial obligations, e.g., alimony or support payments. *In re Flygstad,* 56 B.R. 884, 889–90 (Bankr.N.D. Iowa 1986).

 Before rushing headlong into this analysis, it is important to ascertain who, in fact, are debtor's dependents. The only statutory guidance in this regard is the provision that a debtor's spouse is accorded the status of a dependent, whether or not actually dependent upon the debtor. 11 U.S.C. § 522(a)(1). The Bankruptcy Code is silent as to the circumstances under which children of a debtor cease to be characterized as that debtor's dependents

for purposes of § 522(d)(10)(E). Nevertheless, in light of the analytical focus upon basic needs, the definition of "dependent child" contained within the state statute governing aid to families with dependent children provides an appropriate standard. Under New Jersey law,

> "[d]ependent child" means a child under the age of 18, or under the age of 19 and a full-time student in a secondary school or in the equivalent level of vocational or technical training, if, before he attains age 19, he may reasonably be expected to complete the program of the secondary school or the training....

N.J.S.A. 44:10–1(c); *see also* 42 U.S.C. § 606(a). None of debtor's children is currently under the age of 19, much less a secondary school student. I will, nonetheless, assume, because it ultimately will make no difference, that debtor's college and law school age children are dependents, although I have grave difficulty with the proposition that children aged 19 and older presumptively qualify as dependents under a basic needs analysis and, moreover, that the expense of college and professional school is a "basic need" under any circumstances.

 Just as the expenses of debtor's wife will be considered in the support determination by virtue of her status as a statutory dependent of debtor, so too will her income and assets be considered in the computation of the basic needs of debtor and his dependents. Although no reported decision of which I am aware addresses the treatment of income and assets of a non-debtor spouse under § 522(d)(10)(E), the income of a non-debtor spouse has been considered along with the debtor spouse's income in closely analogous circumstances under the Bankruptcy Code involving subsistence calculations. Perhaps most significantly, for purposes of the confirmation of a Chapter 13 plan under 11 U.S.C. § 1325(b)(1), compliance with the minimum requirements for funding the plan mandates inclusion of a non-debtor spouse's income, as well as expenses, when determining the debtor spouse's "disposable income." *In re Belt,* 106 B.R. 553, 563

(Bankr.N.D.Ind.1989); *see In re Rose*, 101 B.R. 934, 943 (Bankr.S.D.Ohio 1989); *see also In re Saunders*, 60 B.R. 187, 188 (Bankr.N.D.Ohio 1986). Furthermore, income of the non-debtor spouse must be considered when analyzing under 11 U.S.C. § 707(b) whether dismissal of a case filed by a debtor spouse whose debts are primarily consumer-related would be a "substantial abuse" of Chapter 7. *In re Strong*, 84 B.R. 541, 543 (Bankr.N.D.Ind.1988); *see In re Bryant*, 47 B.R. 21, 24–26 (Bankr.W.D. N.C.1984). Moreover, the non-debtor spouse's income is factored in when determining whether to discharge a debtor spouse's student loan due to "undue hardship" under 11 U.S.C. § 523(a)(8)(B). *See Lezer v. New York State Higher Educ. Serv. Corp. (In re Lezer)*, 21 B.R. 783, 789 (Bankr.N.D.N.Y.1982); *Bagley v. Connecticut Student Loan Found. (In re Bagley)*, 4 B.R. 248, 249 (Bankr.D.Ariz.1980). There is no justification for disregarding the impact of a non-debtor spouse's income and assets on a debtor's financial situation. *In re Strong, supra*, 84 B.R. at 543.

Consideration of the non-debtor spouse's income and assets in the basic needs analysis is a necessary counterbalance to the potential for inequity created by the Bankruptcy Code fiction that a non-debtor spouse is a dependent of the debtor spouse regardless of actual dependency. Failure to take into account the non-debtor spouse's income and assets along with that spouse's expenses would effectively place a burden upon debtor's creditors to subsidize some, if not all, of the spouse's daily living expenses, a result not intended by the Code. *In re Kern*, 40 B.R. 26, 29 (Bankr.S. D.N.Y.1984); *In re Saunders, supra*, 60 B.R. at 188. Moreover, ignoring the non-debtor spouse's income and assets creates an opportunity for abuse by an astute potential debtor in the form of a transfer of assets and streams of income into the name of the non-debtor spouse prior to and in contemplation of filing the petition absent, of course, some remedial statutory provision. *Cf.* 26 U.S.C. § 2035 (adjustment in value of decedent's estate for gifts made within three years of death). Without inclusion of the income and assets of the non-debtor spouse in the basic needs analysis, the debtor would receive not only a fresh start, but also an undeserved windfall.

██ While it would be unquestionably defensible to include all of a non-debtor spouse's assets and income in the computation of basic needs, I am mindful of according a liberal construction of the exemption in favor of the debtor. Therefore, I conclude that a non-debtor spouse's income and assets should only be considered under the § 522(d)(10)(E) basic needs analysis in an amount necessary to cover the present and anticipated personal expenses of that spouse as well as that spouse's proportionate share of present and anticipated common expenses. Such a position recognizes the reality that the income of each spouse is generally pooled for the benefit of both spouses, even where the relative earnings are widely disparate. Accordingly, a non-debtor spouse with a relatively large income does not needlessly draw from the funds available to the debtor's creditors, yet is not penalized by essentially being forced to support the debtor who, paradoxically, is transformed into that spouse's dependent. At the same time, this standard of limited inclusion equitably requires that the income and assets of a more dependent non-debtor spouse be fully considered in order to defray the portion of that spouse's expenses which, without such consideration, would be passed on to the debtor spouse's creditors. Essentially, the debtor and the non-debtor spouse are treated, to the extent practicable, as separate and distinct economic actors, rather than artificial dependents upon one another.

██ Having established the analytical framework, it is appropriate, as an initial matter, to pare down the $91,590.00 in annual expenses claimed by debtor to arrive at the basic needs of debtor and his dependents. The $2,400.00 vacation expense and the $2,040.00 expense for gifts are not required for the sustenance of basic needs. *In re Woodford, supra*, 73 B.R. at 681. Likewise, the $1,200.00 in annual expenditures for political contributions and contributions to medical societies falls be-

yond the scope of satisfying basic needs. *See id.* And, of course, the $14,000.00 budgeted annually for debtor's younger daughter's college expenses will be deducted given the fact that by now she has graduated from college. Consequently, $71,950.00 is a more appropriate assessment of the annual expense required to satisfy a very generous definition of the basic needs of debtor and his dependents.

This most generous $71,950.00 figure will be reduced in the near future. Because debtor's eldest daughter is in her last year of law school, the accompanying annual expense of $17,820.00 will cease in June 1991. Similarly, the $16,520.00 yearly expense for debtor's college-age son, and I will assume that he is now in college, will end no later than June 1994. Accordingly, a more realistic appraisal of the expense required for the sustenance of the basic needs of debtor and his dependents is $54,130.00 after June 1991, and $37,610.00 after June 1994.

■ Maintaining the fiction of a constant annual expense in the amount of $71,950.00 for basic needs, this figure must be reduced by that portion which corresponds to debtor's wife's personal expenses and her share of common expenses. Because the allowable budget of $71,950.00 reflects only common expenses from which debtor and his wife appear to benefit equally, $35,975.00 will be offset against the income and assets of debtor's wife. Debtor's wife, who, by all indications, is in good health and has no special needs at the age of fifty, earns an after-tax annual income of approximately $47,000.00 that can reasonably be expected to remain constant for fifteen years into the future, until retirement. Moreover, debtor's wife has assets that include approximately $200,000.00 of equity in the marital home, an interest in the Pension Plan, an IRA currently valued at $33,713.07, a small savings account, and a 1985 190 Mercedes. It is abundantly clear that debtor's wife can cover $35,975.00 in annual expenses, her proportionate share of the common expenses, with her income and assets.

■ Correspondingly, the remaining $35,975.00 in annual expenses can easily be satisfied from debtor's income and assets. Debtor gives himself an after-tax annual income of approximately $56,000.00 from his Manhattan orthopedic practice and intends to continue working at that salary until, at the very least, his son graduates from college in less than four years. Indeed, because debtor is essentially self-employed in the Manhattan practice, he can work at a net income of $56,000.00 even after he reaches seventy and for as long as he remains in good health, his current and foreseeable condition. With regard to assets, debtor, like his wife, also holds approximately $200,000.00 of equity in the marital home, an asset which could be sold were debtor and his wife to move into one of the Co-ops that they own, restricting the office space of PC to the other Co-op. This combination of income and assets is more than sufficient to cover debtor's basic needs until retirement.

■ The fact that debtor was able to accumulate $355,578.00 in pension and retirement benefits between 1980 and 1988 suggests that, with careful planning, debtor can also provide for his basic needs upon retirement. Assuming that debtor continues to work only four more years and allocates only $35,975.00 of income per year toward his basic needs, a substantial retirement fund can be amassed. First, not only will the pre-petition funding for the Pension Plan not appreciably decrease due to any anticipated decline in the number of surgical sessions, but, indeed, it has been augmented post-petition in an annual amount of approximately $30,000.00 from a new source, *i.e.* rent payments on the Co-ops from the PC. Second, as a consequence of his absolute control over the PC, debtor is in a unique position to defer large amounts of income by establishing and funding a new Keogh plan and a new IRA for his exclusive benefit with pre-tax income. Third, in addition to the deferral of income, debtor could, over the four year period, allocate a substantial amount of net income above and beyond that required to fulfill his basic needs for portfolio investment in a private retirement plan. Finally,

upon retirement, debtor will be eligible for social security benefits.

Debtor's clear ability to save for retirement underscores the propriety of denying the exemption for the Pension and Retirement Benefits. Moreover, there is no indication that debtor is burdened by any long-term financial obligations, and there is no evidence that he will have any special needs as retirement approaches, other than perhaps increased medical care and the accompanying expense which can be adequately borne by debtor's new pension and retirement arrangement as supplemented by Medicare.

Judge Moore did not find it necessary to perform the exercise in which I have just engaged before concluding that "family income is sufficient to defray current expenses [and] support Debtor's present lifestyle and the standard that he and his family have been accustomed to prior to filing for bankruptcy." 109 B.R. at 72. His conclusion, however, was eminently correct as was his implicit conclusion that if only the truly *basic* needs of debtor and his dependents were considered, family income is significantly more than "sufficient." Thus, because the basic needs of debtor and his dependents will be met without recourse to debtor's interest in the Pension Plan, the Keogh Plan, and the IRA, the Pension and Retirement Benefits are not reasonably necessary for the support of debtor and his dependents. Accordingly, Judge Moore's conclusion that debtor was not entitled to an exemption under § 522(d)(10)(E) will be affirmed.

In sum, debtor's interest in the Pension Plan, the Keogh Plan, and the IRA are properly characterized as property of the bankruptcy estate under 11 U.S.C. § 541(c)(2) and, moreover, no portion of these Pension and Retirement Benefits is exempt from the estate under 11 U.S.C. § 522(d)(10)(E). The judgment of the

Bankruptcy Court is affirmed in its entirety.

An appropriate order shall issue.[6]

---

**6.** I do not address appellee's belated contention that in addition to debtor's interest in the Pension Plan, the Keogh Plan, and the IRA, she is entitled to interest that has accrued on these Pension and Retirement Benefits since the filing of the petition and all rents, profits and appreciation in value received by debtor from the Co-ops. Appe.Br. at 13. This issue was neither raised in nor addressed by the Bankruptcy Court.